UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ERIC CAMPBELL, individually and as the :
Administrator d.b.n. of the Estate of Erick :
Campbell; MICHAEL CAMPBELL, as the :
Administrator of the Estate of Robert :
Campbell; and AIDA CAMPBELL, :
                    Plaintiffs, :
v. :
 :
CITY OF YONKERS; POLICE OFFICER : **<u>OPINION AND ORDER</u>**
TIMOTHY COOPER; POLICE OFFICER :
THOMAS BRAIG; POLICE OFFICER :
ADAM WALENCIK; DETECTIVE THOMAS :
MARELLO; SERGEANT MARK WISSNER; : 19 CV 2117 (VB)
DETECTIVE BRIAN MENTON; :
DETECTIVE TERENCE MALONE; :
SERGEANT JOSEPH BAROSA; :
DETECTIVE MICHAEL MCGEE; AGENT :
BRENDAN KENNEY; AGENT ANDREW :
FISHER; AGENT DANIEL CONLON; and :
AGENT DANIEL MCKENNA, :
                 Defendants. :
--------------------------------------------------------------x
ERIC CAMPBELL, individually and as the :
Administrator d.b.n. of the Estate of Erick :
Campbell; MICHAEL CAMPBELL, as the :
Administrator of the Estate of Robert :
Campbell; and AIDA CAMPBELL, :
                    Plaintiffs, : 19 CV 9444 (VB)
v. :
 :
UNITED STATES OF AMERICA, :
                 Defendant. :
--------------------------------------------------------------x

<u>Briccetti, J.</u>:

      These consolidated actions arise out of the attempted arrest and fatal shooting of Erick

Campbell during a surveillance operation conducted by federal and local law enforcement

officers.  Plaintiffs, members of Campbell's family and the administrator of his estate,[1] bring federal and related state law claims against the law enforcement officers involved in the operation, the City of Yonkers, and the United States of America, pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) ("Monell"),  Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens"), and the Federal Tort Claims Act ("FTCA").

Now pending are four motions for summary judgment, filed by (i) Federal Bureau of Investigation ("FBI") Special Agents Brendan Kenney, Andrew Fisher, and Daniel Conlon; Supervising Special Agent Daniel McKenna (the "FBI defendants"); and the United States (together with the FBI defendants, the "federal defendants") (Doc. #169 and FTCA Doc. #89);[2] (ii) Tarrytown Police Department ("TPD") Detective Michael McGee and Sergeant Joseph Barosa (the "Tarrytown defendants") (Doc. #174); (iii) Yonkers Police Department ("YPD") Officers Timothy Cooper, Thomas Braig, and Adam Walencik; Sergeant Mark Wissner; Detectives Thomas Marello and Brian Menton; and the City of Yonkers (the "Yonkers defendants") (Doc. #178); and (iv) Westchester County Police Department ("WCPD") Detective Terence Malone (Doc. #186).[3]

---

[1]     Plaintiff Eric Campbell is Campbell's son and the administrator of his estate.  Plaintiff Aida Campbell is Campbell's mother.  Robert Campbell, Campbell's father, was a plaintiff in these cases, both individually and as the original administrator of Campbell's estate, before his death in September 2021.  Michael Campbell was then substituted as a plaintiff, in his capacity as the administrator of Robert Campbell's estate.

[2]     Unless otherwise noted, "Doc. #__" refers to documents filed in the lead case, 19 Civ. 2117; "FTCA Doc. #__" refers to documents filed in the member case, 19 Civ. 9444.

[3]     The individual defendants who are not FBI agents—Barosa, Braig, Cooper, Malone, Marello, McGee, Menton, Walencik, and Wissner—are collectively referred to herein as the "local police defendants."

For the following reasons, the federal defendants' and the Yonkers defendants' motions are GRANTED IN PART and DENIED IN PART, and the Tarrytown defendants' and Malone's motions are GRANTED.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

The Court presumes the parties' familiarity with the factual allegations and procedural history of these actions, including the Court's Opinion and Order dated September 15, 2020, which ruled on the federal defendants' and Malone's motions to dismiss.  (Doc. #107 and FTCA Doc. #34 (the "MTD Decision")).[4]  Accordingly, the Court summarizes below only the relevant background, as reflected in the parties' memoranda of law, statements of undisputed material facts pursuant to Local Civil Rule 56.1, and supporting declarations and exhibits.

I.      The Task Force

When the events relevant to this action occurred, the FBI defendants and three of the local police defendants, Marello, Menton, and Malone, were members of the FBI Westchester County Safe Streets Gang and Violent Crime Task Force, Squad C-26 (the "task force").  Marello, Menton, and Malone were formally deputized and assigned to serve as Task Force Officers ("TFOs"), pursuant to Memorandums of Understanding between the FBI and their respective agencies.  (Doc. #187-3).

The other individual defendants were not members of the task force.  However, they agreed to assist with the surveillance operation, at the request of Kenney and Menton.[5]

---

[4]      The operative pleadings in these consolidated actions are plaintiffs' October 11, 2019, complaint filed against the United States (FTCA Doc. #1 ("Compl.")), and plaintiffs' November 4, 2019, second amended complaint, filed against all other named defendants (Doc. #67 ("SAC")).

[5]      The individual defendants are collectively referred to herein as the "team."

II.     The Surveillance Operation

        In the month before the surveillance operation, the task force was investigating two bank

robberies, which occurred at a Chase Bank in Tarrytown, New York, on November 13, 2017, and

a Chase Bank in Elmsford, New York, on December 7, 2017.  During both robberies, an

unknown individual wore a dark mask, displayed a firearm, and fled the scene in a stolen

vehicle.

        The getaway car in the Tarrytown robbery was discovered by the FBI on November 20,

2017.  The car was apparently abandoned and bore New York license plates registered to a

different vehicle.

        On the night of December 14, 2017, members of the Greenburgh Police Department

("GPD") located a stolen Oldsmobile sedan on a residential street in Yonkers, New York,

believed to be the getaway car from the Elmsford robbery.  A GPD detective notified Kenney.

They decided GPD would maintain surveillance of the vehicle overnight and the task force

would relieve GPD in the morning.

        During the night, task force members including Kenney, Fisher, McKenna, Marello, and

Menton, discussed a plan to surveil the vehicle and to arrest any individual who entered it for

possession of a stolen vehicle.  Kenney was designated the leader of the operation.

        Around 6:00 a.m. on December 15, Fisher and Marello took over surveillance from GPD,

as planned.  Kenney then requested assistance from other task force members.  In addition,

Kenney asked Menton to request backup from YPD, Menton's home agency.  Menton called

Wissner, who led YPD's plainclothes pattern crimes unit, to ask if Wissner had any officers

available to assist with the operation.  Three members of the unit—Braig, Cooper, and

Walencik—agreed to provide the requested backup, as did Wissner himself.  Barosa and McGee,

who led TPD's investigation of the Tarrytown robbery, also assisted with the operation at Kenney's request.

The team members arrived at the scene at various times that morning and afternoon. Upon arrival, they were briefed by Kenney or Menton, who explained they were surveilling a vehicle used in an armed bank robbery and the person who entered the vehicle might have a gun. Team members were given FBI radios for communicating during the operation.

Early that afternoon, Fisher obtained a warrant to install a GPS tracking device on the vehicle. FBI agents installed and turned on the device shortly thereafter. But because Kenney had a "hunch" the subject was going to rob a third Chase Bank location on December 15, the team planned to continue surveillance until around 6:00 p.m., when most banks in the area closed. (Doc. #197-9 ("Kenney Dep.") at 50).[6] If the subject did not show up that evening, the task force would monitor the vehicle via the GPS device.

Around 3:50 p.m., Marello radioed that a man, wearing dark clothing and holding a bag, was approaching the subject vehicle.

The man—identified after the shooting as Erick Campbell—entered the vehicle through the front passenger side door, placed a duffel bag inside, and started the engine. He then exited the vehicle from the driver's side door and began clearing snow from the vehicle. After Campbell reentered the vehicle, Kenney directed the team to converge.

Kenney positioned his unmarked law enforcement vehicle a few inches behind the subject vehicle, while Malone approached from the front in an unmarked rental vehicle. Both then exited their vehicles, with guns drawn. Soon thereafter, Braig, accompanied by Cooper, pulled his unmarked vehicle up alongside the driver's side of the subject vehicle. Other team

---

[6]     Citations to "Dep. at _" refer to the page number at the top right-hand corner of each deposition transcript page.

members parked their own unmarked vehicles nearby and approached on foot, with weapons

drawn.  The team announced themselves as "police" and shouted at Campbell to "turn off the

car," "get out of the car," and "show me your hands."  (Kenney Dep. at 111; Doc. #197-3

("Malone Dep.") at 129–30; Doc. #197-5 ("Braig Dep.") at 137; Doc. #197-6 ("Menton Dep.")

at 91; Doc. #197-12 ("Barosa Dep.") at 80).

When the team converged, Campbell tried to drive away.  As Campbell began pulling

away from the curb, Braig's vehicle collided with Campbell's vehicle and pushed it back

between Kenney's and Malone's vehicles.  Campbell moved the subject vehicle back and forth

several times to try to flee.  However, Kenney repeatedly rammed into the vehicle to keep it

wedged between Malone's vehicle and his own, until Campbell's vehicle became disabled.

The parties disagree about what happened next.

Defendants claim Campbell reached over to the passenger seat, picked up what appeared

to be a black handgun (but was later determined to be a replica), and pointed it toward one or

more officers.

According to Marello, as he ran up to the passenger side of the vehicle from the rear, he

saw Campbell reach over to the passenger seat and pick up the replica gun.  Marello testified he

shouted "gun" several times to warn the other team members.  (Doc. #197-15 ("Marello Dep.")

at 90).  He then moved behind Braig's vehicle after hearing another officer yell "watch the

crossfire" and realizing he was at risk of being shot by or shooting other officers.  (Id. at 92–97).

Meanwhile, Cooper was in the passenger seat of Braig's vehicle, near the driver's side of

the subject vehicle and approximately three to four feet away from Campbell.  Cooper testified

he saw Campbell "reach down to the passenger side interior of the floorboard," heard someone

yell "he's got a gun," and then saw Campbell "pull up with a gun in his right hand."  (Doc. #197-

4 ("Cooper Dep.") at 133–37, 143–44).  Cooper further testified he saw Campbell point the

replica gun toward the front passenger side of the vehicle, and believed Campbell "intend[ed] to shoot those officers on the sidewalk."  (Id. at 143).  "A second or two" later, without warning anyone he was going to shoot, Cooper fired his own weapon at Campbell's chest.  (Id. at 140).  Cooper fired sixteen rounds, the capacity of his weapon.  Cooper testified he kept firing until he was out of ammunition, even though he was "fairly certain" he had hit Campbell, because Campbell "was still moving and still had a gun in his hand."  (Id. at 144–47).

Shortly before the shooting started, Braig was standing on the driver's side of his own vehicle, looking over the roof and down into the subject vehicle.  He testified he saw Campbell's right hand reach toward the passenger seat, disappear for a moment, and then reappear holding the replica gun, right as "somebody yelled gun."  (Braig Dep. at 143–44).  Braig claims he then saw Campbell "swinging his right arm from the passenger seat up into the direction towards our car."  (Id. at 146).  At that point, Braig "heard the gunshots," saw "glass flying everywhere," and "thought [Cooper] was being shot by this guy."  (Id. at 145–47).  Seconds after hearing the gunshots, Braig fired his own weapon at Campbell.  (Id. at 147).  Braig fired three shots at Campbell.  Braig claims he stopped shooting when he saw Campbell's hand was down and thus Campbell no longer posed a threat.  (Id. at 151–52).

When Kenney first heard "gun," he was behind the subject vehicle and could not see Campbell's hands.  He "had tunnel vision at that point" and was focused on Campbell's head.  (Kenney Dep. at 123).  Kenney testified that when the shots fired by Cooper and Braig blew out the back passenger-side window of the subject vehicle, he thought Campbell had fired on Malone, who Kenney believed was standing on that side of the vehicle.  (Id. at 125–26, 128).  Kenney then fired two shots at Campbell, aiming for his head.  Kenney claims he shot Campbell "[t]o save" Malone.  (Id. at 128).  Kenney did not warn that he was going to shoot before firing his weapon, and did not hear any officer do so.

7

The shooting lasted only a few seconds.  Of the twenty-one rounds fired, ten hit Campbell.  Most of the rounds entered the left side of Campbell's torso and back; two of those perforated his left lung.  (Doc. #172-14 ("FBI Inspector's Report") at 10, 13; Doc. #172-31 ("Autopsy Report") at ECF 6).[7]

Plaintiffs dispute that any officer saw Campbell brandishing the replica gun before or during the shooting.  In support, plaintiffs offer testimony from Barosa and McGee that heavy snow and exhaust fumes made the visibility so bad they could not see anything inside the vehicle—even though Barosa was right next to the driver's side door and McGee was next to the passenger's side, right by Marello.  (Barosa Dep. at 69–70, 78; Doc. #197-13 ("McGee Dep.") at 52–54).  In addition, plaintiffs argue Marello's account of events—in which Campbell purportedly brandished the gun while simultaneously changing gears and steering—would have required Campbell to have three hands.  (Doc. #196 ("Pls. Opp.") at 25 (citing Marello Dep. at 86–89)).  Plaintiffs also note no fingerprints were found on the replica gun.

Plaintiffs further contend that even if Campbell did raise the replica gun, there is a question of fact as to whether he pointed it at any officers.  For example, although Cooper testified he shot Campbell to save "those officers on the sidewalk" (Cooper Dep. at 143) , McGee's testimony indicates he and the other officers who had been standing on the sidewalk—Marello and Malone—had already moved away from the subject vehicle and were back by Kenney's vehicle when Cooper fired his weapon.  (McGee Dep. at 60; see also Marello Dep. at 100–03).

Immediately after the shooting stopped, several officers emerged from the positions where they had taken cover and approached the subject vehicle.  McGee testified he saw

---

[7]     "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

Campbell through a bullet hole in the rear passenger window, and that Campbell was facing the passenger side window, with his shoulder blades pressed against the driver's side door. According to McGee, the replica gun was on the passenger seat, with Campbell's "fingertips at the edge of the weapon on the seat."  (McGee Dep. at 62).

McGee then reached through the bullet hole and unlocked the front passenger door of the subject vehicle.  He picked up the replica gun, at which point he realized it was not real, and put it on the roof of the car, along with the duffel bag.  Malone and Menton removed Campbell from the vehicle and placed him on the ground.

At that point—less than a minute after the shooting ended—Menton called an ambulance, while Barosa patted Campbell down and inspected him for injuries.  Campbell "seemed to be on the verge of death."  (Barosa Dep. at 82).  And although Campbell initially had a pulse, "that quickly stopped" and he seemed to stop breathing.  (Id. at 82–83).  Barosa and McGee immediately began administering CPR, and asked Menton to expedite emergency medical personnel.  Menton then made another radio call, requesting a rush on the ambulance.  (Menton Dep. at 107–08; Doc. #179-20 ("YPD Radio Log") at ECF 1).

At some point before the ambulance came, a YPD Emergency Services Unit arrived at the scene.  They took over CPR from Barosa and McGee and used a defibrillator on Campbell.

The ambulance arrived approximately twelve minutes after the shooting.  Campbell was transported to a hospital, where he died from the gunshot wounds to his torso less than an hour after the shooting.  (Autopsy Report at ECF 2; FBI Inspector's Report at 13).

III.   Plaintiffs' Claims

Plaintiffs bring Bivens claims against the FBI defendants, and Section 1983 claims against the other individual defendants, for purported violations of Campbell's constitutional rights.  Specifically, plaintiffs claim Campbell's Fourth Amendment rights were violated in four

main ways:  (i) Cooper, Braig, and Kenney used excessive force when they fired their weapons;

(ii) the team used excessive force when boxing in the subject vehicle; (iii) the team's tactical

decisions and certain omissions from the plan made the use of deadly force inevitable; and

(iv) the non-firing defendants failed to prevent or stop the use of deadly force.  Plaintiffs further

claim the individual defendants violated Campbell's Fifth and Fourteenth Amendment rights by

failing timely to provide adequate medical care.  Plaintiffs also bring related state-law claims

against individual defendants.[8]

     In addition, plaintiffs bring <u>Monell</u> claims against the City of Yonkers for the purported

constitutional violations, on the ground that the City did not adequately train YPD officers

regarding its use of force policies, and <u>respondeat superior</u> claims for the YPD officers' alleged

torts.

     Finally, plaintiffs assert FTCA claims against the United States for (i) assault and battery;

(ii) wrongful death; (iii) conscious pain and suffering; and (iv) loss of love, support, and familial

relationships.

---

[8]     In the MTD Decision, the Court dismissed plaintiffs' claims against the federal
defendants and Malone for (i) purported violations of the First and Eighth Amendments; (ii)
unlawful search and seizure in contravention of the Fourth Amendment; (iii) conspiracy to
violate Campbell's constitutional rights; (iv) negligence; (v) negligent hiring, training, and
supervision; and (vi) negligent and intentional infliction of emotional distress.  (<u>See</u> MTD
Decision at 11–13, 22–24, 28–31).

     The Yonkers defendants and Tarrytown defendants, who did not file motions to dismiss,
argue they are entitled to summary judgment on those same claims.  (<u>See</u> Doc. #175 ("Tarrytown
Mem.") at 11–12; Doc. #180 ("Yonkers Mem.") at 10–12, 17–19).  Plaintiffs' opposition brief
makes no attempt to respond to defendants' arguments regarding those claims.  Accordingly, the
Court deems the claims abandoned.  <u>See</u> <u>Jackson v. Federal Exp.</u>, 766 F.3d 189, 195 (2d Cir.
2014) ("[A] partial response arguing that summary judgment should be denied as to some claims
while not mentioning others may be deemed an abandonment of the unmentioned claims.");
<u>Cowan v. City of Mount Vernon</u>, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015) (granting summary
judgment on claims because of plaintiff's failure to respond to defendant's arguments).  And in
any event, the claims fail as a matter of law, for the reasons set forth in the MTD Decision.

**DISCUSSION**

I.      Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[9]

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.

2010).  It is the moving party's burden to establish the absence of any genuine issue of material

fact.  Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its

case on which it has the burden of proof, then summary judgment is appropriate.  Celotex Corp.

v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence,

summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The

non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts and may not rely on conclusory allegations or unsubstantiated speculation."

Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  "[T]he mere existence of a scintilla

---

[9]       Unless otherwise indicated, case quotations omit all internal citations, quotations,
footnotes, and alterations.

of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it.  Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the [non-moving] party" on the issue on which summary judgment is sought, "summary judgment is improper."  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

Importantly, "in cases in which officers have used deadly force, leaving the witness most likely to contradict the officers' version of the events unable to testify, the court may not simply accept what may be a self-serving account by the police officer but must instead consider circumstantial evidence that, if believed, would tend to discredit the police officer's version and must undertake a fairly critical assessment of, inter alia, the officer's original reports or statements to decide whether the officer's testimony could reasonably be rejected at a trial."  Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017).

II.      Bivens Claims Against the FBI Defendants

In its September 2020 MTD Decision, the Court dismissed all of plaintiffs' claims against the FBI defendants, except the Bivens claims for excessive force and deliberate indifference to serious medical needs.  The FBI defendants argue the Bivens claims cannot stand in light of intervening Supreme Court precedent, specifically Egbert v. Boule, 142 S. Ct. 1793 (2022), decided in 2022.

The Court agrees.

A.      Applicable Law

In Bivens, the Supreme Court implied a private right of action under the Fourth

Amendment for an unreasonable search and seizure claim against federal drug enforcement

agents who handcuffed a man in his own home without a warrant.  See Bivens v. Six Unknown

Narcotics Agents, 403 U.S. 388, 389, 397 (1971).  "Since then, the Supreme Court has

recognized Bivens claims in only two other circumstances: (1) under the Fifth Amendment's

Due Process Clause for gender discrimination against a congressman for firing his female

secretary, and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment

against prison officials for failure to treat an inmate's asthma which led to his death."  Rivera v.

Samilo, 370 F. Supp. 3d 362, 366 (E.D.N.Y. 2019) (citing Davis v. Passman, 442 U.S. 228

(1979), and Carlson v. Green, 446 U.S. 14 (1980)).

In Egbert v. Boule, the Supreme Court set out a two-step inquiry for courts to determine

whether to imply a Bivens cause of action.  First, the court must determine "whether the case

presents 'a new Bivens context,'—i.e., is it 'meaningfully' different from the three cases in

which the [Supreme] Court has implied a damages action."  Egbert v. Boule, 142 S. Ct. at 1803

(quoting Ziglar v. Abbasi, 582 U.S. 120, 139–40 (2017)).  The Supreme Court's "understanding

of a 'new context' is broad."  Hernandez v. Mesa, 140 S. Ct. 735, 743 (2020).  For example, "a

new context arises when there is a new constitutional right at issue," Egbert v. Boule, 142 S. Ct.

at 1807, or when the defendants were operating under a different "statutory or legal mandate."

Ziglar v. Abbasi, 582 U.S. at 139–40.  And importantly, "[a] claim may arise in a new context

even if it is based on the same constitutional provision as a claim in a case in which a damages

remedy was previously recognized."  Hernandez v. Mesa, 140 S. Ct. at 743.

"Second, if a claim arises in a new context, a Bivens remedy is unavailable if there are

'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to

13

'weigh the costs and benefits of allowing a damages action to proceed.'"  Egbert v. Boule, 142 S.
Ct. at 1803 (quoting Ziglar v. Abbasi, 137 S. Ct. at 1858).  Because "recognizing a cause of
action under Bivens is a disfavored judicial activity," a court may not imply a Bivens remedy if
there is "[e]ven a single sound reason to defer to Congress."  Id.  According to the Supreme
Court, "in most every case," it is Congress, not the judiciary, "who should decide whether to
provide for a damages remedy."  Id.  Moreover, "a court may not fashion a Bivens remedy if
Congress already has provided, or has authorized the Executive to provide, an alternative
remedial structure"—even if "existing remedies do not provide complete relief" or a "a wrong . .
. would . . . go unredressed" without a judicial remedy.  Id. at 1804.

The Egbert Court held a plaintiff had no Bivens remedy against a border patrol agent who
allegedly entered the plaintiff's property without a warrant and assaulted him.  First, the Court
found the claim presented a new context for Bivens purposes and that Congress was better
equipped to decide whether to provide a damages remedy.  Egbert v. Boule, 142 S. Ct. at 1805.
In doing so, the Court acknowledged Bivens also involved allegations of excessive force and
thus the two cases "arguably present 'almost parallel circumstances' or a similar 'mechanism of
injury.'"  Id.  However, the Court reasoned "these superficial similarities are not enough to
support the judicial creation of a cause of action."  Id.  Second, the Court concluded "Congress
has provided alternative remedies for aggrieved parties in [the plaintiff's] position"—namely,
internal investigations of alleged misconduct and the Border Patrol's grievance process—which
"independently foreclose[d] a Bivens action."  Id. at 1806.

B.    Application

Although this Court previously concluded plaintiffs had pleaded Bivens claims against
the FBI defendants, the Court must reconsider its conclusion in light of Egbert v. Boule.  Having

14

done so, the Court is convinced the Supreme Court, if confronted with plaintiffs' claims, would find no cause of action under Bivens.

First, there are several meaningful differences between this case and Bivens, such that plaintiffs' asserted claims arise in a new context.  Bivens involved a warrantless arrest and search of the plaintiff's home, whereas this case involves an arrest made on a public street with probable cause.  Moreover, the officers involved in Bivens were federal drug enforcement agents, whereas here the officers were FBI agents, task force officers, and other local law enforcement officers.  And the Court in Bivens reasoned that the right at issue was primarily a Fourth Amendment right to privacy, 403 U.S. at 389, whereas here the Fourth Amendment right at issue is the right to be free from excessive force.

Plaintiff's deliberate indifference claim also arises in a new context.  Plaintiffs' allegations materially differ from those in Carlson v. Green, the only case in which the Supreme Court has found a Bivens remedy for constitutionally inadequate medical care.  446 U.S. 14 (1980).  The defendants in Carlson v. Green were federal prison officials who allegedly failed to treat an inmate's asthma, not law enforcement officers who allegedly delayed treatment of an arrestee's injuries.  Id. at 16.  Moreover, the claim in Carlson v. Green was brought under the Eighth Amendment, as opposed to plaintiffs' Fifth Amendment claim here.  Id.

With respect to the second step in the Bivens analysis, several factors counsel hesitation in extending Bivens to plaintiffs' claims.  First, there are sound reasons to believe Congress is better suited to decide whether to permit a damages action for aggrieved parties in plaintiffs' position:

> It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others.  It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations.  Yet the decision to recognize a

> damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies.

Ziglar v. Abbasi, 137 S. Ct. at 1858; see also Egbert v. Boule, 142 S. Ct. at 1803 ("[A] court likely cannot predict the systemwide consequences of recognizing a cause of action under Bivens.").

Moreover, there are multiple alternative remedial structures available to plaintiffs on their claims against the FBI Defendants. Plaintiffs could—and did—bring tort claims against the United States under the FTCA. And pursuant to Department of Justice and FBI policy, the FBI conducted an internal investigation after the shooting. (See generally FBI Inspector's Report; Doc. #173). These alternative remedies "independently foreclose a Bivens action." Egbert v. Boule, 142 S. Ct. at 1806.

Accordingly, plaintiffs' Fourth and Fifth Amendment claims against the FBI defendants must be dismissed.

III.     Section 1983 Claims Against the Local Police Defendants

   A.     Excessive Force Claims

Braig and Cooper argue they are entitled to summary judgment on plaintiffs' excessive force claims because the amount of force they used was reasonable as a matter of law. Barosa, Malone, Marello, Menton, McGee, Walencik, and Wissner argue they are entitled to summary judgment because the undisputed facts establish they did not use excessive force or have a reasonable opportunity to prevent the use of excessive force. The local police defendants also argue they are entitled to summary judgment on the basis of qualified immunity.

The Court disagrees that Braig and Cooper are entitled to summary judgment with respect to plaintiffs' excessive force claim against them premised on their use of deadly force. However, the Court agrees plaintiffs' other excessive force claims must be dismissed.

       1.    Applicable Law

"A police officer violates the Fourth Amendment if the amount of force he uses in effectuating an arrest is 'objectively unreasonable' in light of the facts and circumstances confronting' the officer." Lennox v. Miller, 968 F.3d 150, 155 (2d Cir. 2020) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989). Determining "whether an officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

"The fact that a person whom a police officer attempts to arrest resists no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit." Brown v. City of New York, 798 F.3d 94, 103 (2d Cir. 2015). And "an officer's use of deadly force in a police shooting case is not, as a matter of law, reasonable unless that officer had probable cause to believe that the individual posed a significant threat of death or serious physical injury to the officer or others." Callahan v. Wilson, 863 F.3d 144, 152 (2d Cir. 2017).

In addition, "planners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force." Terebesi v. Torreso, 764 F.3d 217, 234 (2d Cir.

2014).  "A defendant who plans or directs an unreasonable use of force is liable for the resulting

constitutional violation as a direct participant."  Id.  On the other hand, a defendant cannot be

held liable for excessive force on the grounds that he "himself created the situation in which the

use of deadly force became necessary by violating police procedure" before the shooting, or that

his "ill-conceived ruse, which did not contemplate excessive force, provoked [a] deadly

confrontation."  Id. at n.16.

Finally, "all law enforcement officials have an affirmative duty to intervene to

protect the constitutional rights of citizens from infringement by other law enforcement officers

in their presence."  Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).  "Failure to intercede

results in liability where an officer observes excessive force is being used or has reason to know

that it will be."  Jean-Laurent v. Wilkerson, 461 F. App'x 18, 21 (2d Cir. 2012) (summary order).

"However, in order for liability to attach, there must have been a realistic opportunity to

intervene to prevent the harm from occurring."  Id.

"In each case, the question whether a defendant had a realistic chance to intercede will

turn on such factors as the number of officers present, their relative placement, the environment

in which they acted, the nature of the assault, and a dozen other considerations."  Figueroa v.

Mazza, 825 F.3d 89, 107 (2d Cir. 2016).  "Among these considerations, of course, the assault's

duration will always be relevant and will frequently assume great importance."  Id.  "The

essential inquiry is whether, under the circumstances actually presented, an officer's failure to

intervene permits a reasonable conclusion that he became a tacit collaborator in the unlawful

conduct of another."  Id. at 107–08.

"In light of the fact-specific nature of the inquiry on an excessive force claim, granting

summary judgment against a plaintiff on such a claim is not appropriate unless no reasonable

factfinder could conclude that the officers' conduct was objectively unreasonable." <u>Lennox v. Miller</u>, 968 F.3d at 155.

       2.    <u>Use of Deadly Force</u>

It is undisputed that Braig and Cooper, but none of the other local police defendants, shot Campbell.  And here, plaintiffs have raised genuine, material disputes as to "the facts and circumstances confronting" Braig and Cooper when they fired their weapons, and thus as to whether their use of deadly force was "objectively reasonable."  <u>Lennox v. Miller</u>, 968 F.3d at 155.

The reasonableness of Cooper's initial decision to fire his weapon largely depends on whether, as he claims, he reasonably believed Campbell posed a significant threat of death or serious injuries to officers standing by the passenger side of the subject vehicle.  Similarly, the reasonableness of Braig's decision to fire his weapon depends on whether he reasonably believed Campbell was firing at Cooper.  And the reasonableness of each officer's decision to fire subsequent shots depends on whether they reasonably believed Campbell remained a threat when they fired those additional rounds.  <u>See</u> <u>Estate of Jaquez v. City of New York</u>, 104 F. Supp. 3d 414, 437 (S.D.N.Y. 2015) ("While it may have been reasonable for [the officer] to use lethal force earlier in the altercation when [the decedent] threatened the officers with a knife, such authority does not extend indefinitely.").

These are jury questions.

On the one hand, the record contains evidence from which a reasonable jury could conclude Cooper and Braig had probable cause to believe Campbell posed a significant threat to officers before and throughout the shooting.  For example, the replica gun was found on the passenger seat, "in close proximity" to Campbell's right hand, from which a reasonable juror might conclude Campbell brandished it.  (McGee Dep. at 64).  And jurors could certainly credit

testimony by Cooper, Braig, and Marello that they saw Campbell point the gun at other officers, as well as Malone's testimony that he was standing by the passenger side of the subject vehicle throughout the shooting.

On the other hand, the record also contains "circumstantial evidence that, if believed, would tend to discredit" Cooper's and Braig's explanations for why they shot Campbell.  Soto v. Gaudett, 862 F.3d at 157.  For example, jurors could credit McGee's testimony that he, Malone, and Marello were no longer standing by the passenger side of the subject vehicle when Cooper began firing.  A reasonable juror could also infer from autopsy evidence regarding the location of the bullet wounds, combined with McGee's testimony that both of Campbell's "shoulder blades were pressed against the driver's door" immediately after the shooting, that Campbell was not pointing the gun in Cooper's direction when Braig fired at least one of the rounds.  (McGee Dep. at 62).  Moreover, jurors could use autopsy evidence regarding the severity of the wounds, and testimony that Campbell was "on the verge of death" a minute after the shooting ended, to determine Braig and Cooper could not have reasonably believed Campbell was a threat when they fired their final shots.  (Barosa Dep. at 82).

In short, there are triable issues of fact as to whether Cooper's and Braig's use of deadly force was reasonable.  And "disputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) is the province of the jury."  Jones v. Treubig, 963 F.3d 214, 231 (2d Cir. 2020); see also Terebesi v. Torreso, 764 F.3d at 240 ("The credibility of [an officer's] recollection and the sufficiency of the asserted basis for his mistaken impression that [the decedent] was firing at the officers are . . . matters to be determined by the factfinder.").

Accordingly, summary judgment as to Braig and Cooper on plaintiffs' excessive force claim is not warranted.

3.      The Box-In Maneuver

No reasonable juror could conclude the local police defendants used excessive force when boxing in the subject vehicle.

The undisputed facts show only Kenney, Braig, and Malone's vehicles made contact with the subject vehicle during the operation, and that they did not do so until <u>after</u> Campbell tried to flee.  Braig's vehicle collided with Campbell's as Campbell pulled away from the curb.  After that collision, Campbell reversed into Kenney's vehicle.  Kenney then "pressed the accelerator and rammed [Campbell] into [Malone's] car." (Kenney Dep. at 115–16).  As Campbell moved back and forth to try to escape, Kenney repeatedly "push[ed] [Campbell's] car forward into [Malone's] car to keep it pinned." (<u>Id</u>. at 119).

There is also no genuine dispute that when Kenney, Braig, and Malone used their vehicles to prevent Campbell from leaving the scene, they believed he was connected to—and had likely committed—two armed bank robberies, and might be armed at that moment.  And although plaintiffs speculate that Campbell may not have known he was surrounded by police or heard the officers' commands to show them his hands and get out of the car (Pl. Opp. at 23), those commands <u>were</u> shouted.  (<u>See</u> Doc. #171 ("Fed. Defs. 56.1 Statement") ¶ 43).[10]  As such, a reasonable officer could have believed Campbell refused to submit to arrest and was attempting to flee the scene.  Thus, on the undisputed facts, viewed "from the perspective of a reasonable

---

[10]      Plaintiffs purport to "dispute that these commands were yelled" on the grounds that "there is no audio or video recording of the shooting." (Doc. #198 ("Pls. 56.1 Response to Fed. Defs.") ¶ 43).  But plaintiffs' contention is mere speculation, unsupported by any citation to evidence.  Accordingly, for the purpose of deciding the motions, the Court finds it undisputed that team members yelled the commands enumerated in the corresponding statement of material fact.  <u>See</u> <u>Baity v. Kralik</u>, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("[R]esponses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact," pursuant to Local Civil Rule 56.1).

officer on the scene," the force used to trap Campbell's vehicle was objectively reasonable.

Kisela v. Hughes, 138 S. Ct. at 1152.

Accordingly, plaintiffs' excessive force claim premised on the use of force during the box-in maneuver must be dismissed.

> 4.   Planner Liability

Plaintiffs claim Marello and Menton "could . . . be held liable under" Terebesi v. Torreso, 764 F.3d 217, because they helped Kenney develop the plan for the operation.  (Pls. Opp. at 30). But this claim fails as a matter of law.

The undisputed facts show the plan did not "provide[ ] for . . . an unconstitutionally excessive use of force."  Cf. Terebesi v. Torreso, 764 F.3d at 234.  With respect to the use of deadly force, Menton testified "the plan was to get [Campbell] out of the car peacefully, but [Campbell] kind of changed the plan."  (Menton Dep. at 133).  Indeed, plaintiffs themselves point out "the potential that officers would need to use their weapons," and "how the Team would use force," were "not part of the Plan and were not briefed to the Team."  (Pls. Opp. at 3–4).  And for the reasons stated above, the planned box-in maneuver does not constitute excessive force, so there can be no "planner" liability with respect to that alleged use of force.

Plaintiffs' policing practices expert might be correct that the plan was "overly vague," lacked "critical information," and "required unreasonably close contact between numerous officers and the bank robbery suspect" (Doc. #197-1 at 12–13), and thus "created a tactical scenario whereby the use of deadly force against Erick Campbell was the foreseeable and likely outcome."  (Id. at 11).  But developing an "ill-conceived" plan does not implicate an excessive force claim, unless the operation "as planned, even if it had gone perfectly," constituted an excessive use of force.  Terebesi v. Torreso, 764 F.3d at 235 n.16.

Accordingly, to the extent plaintiffs assert a planner liability claim against Marello and Menton, this claim must be dismissed.

>     5.     Failure to Intervene

No reasonable juror could conclude the non-firing local police defendants—Barosa, Malone, Marello, Menton, McGee, Walencik, and Wissner—had a realistic opportunity to prevent or stop the shooting.

The undisputed facts show the shooting happened in a matter of seconds and that no officer warned he was going to shoot before opening fire.  Nor is there a genuine dispute that when the shooting began, Walencik and Wissner were not close to the scene and the other non-firing defendants had taken cover behind various police vehicles.  Accordingly, the record establishes these defendants could not have intervened to stop the shooting.  See Crockett v. City of New York, 2015 WL 5719737, at *7 (E.D.N.Y. Sept. 29, 2015) ("Based upon the distances between the Other Defendant–Officers and [the firing officer], and the fact that the two shots were fired in rapid succession and without notice or warning, the Other Defendant–Officers did not have a realistic opportunity to intervene to prevent the shooting.").

The Court is not persuaded the defendants "should have known" the surveillance operation "would lead to the inevitable use of deadly force" and thus were obligated to "intervene" by objecting to the plan or removing their subordinates from the operation.  (Cf. Pls. Opp. at 31).  As explained above, the plan did not provide for the use of deadly force, or even address the possibility that officers might need to use their weapons.  Under these circumstances, the non-firing police defendants did not "have reason to know" deadly force would be used. Jean-Laurent v. Wilkerson, 461 F. App'x at 21.

Accordingly, plaintiffs' failure to intervene claims against Barosa, Malone, Marello, Menton, McGee, Walencik, and Wissner must be dismissed.

23

6.     Qualified Immunity

Braig and Cooper argue that, to the extent the record supports an excessive force claim, such claim should be dismissed because they are entitled to qualified immunity, as a matter of law.[11]

The Court disagrees.

Qualified immunity shields government officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996).  "Defendants bear the burden of establishing qualified immunity."  Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

In the context of an excessive force claim, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances."  Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995); see also O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) ("in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry on the merits.").

---

[11]     The Court need not consider whether the other local police defendants are entitled to qualified immunity, since plaintiffs' claims against them fail on the merits.

Here, as explained above, there are genuine material issues of fact as to whether Braig and Cooper's use of deadly force during the surveillance operation was reasonable under the circumstances.

Accordingly, summary judgment in favor of Braig and Cooper on the basis of qualified immunity is inappropriate.

B.     Deliberate Indifference to Serious Medical Needs Claim

The local police defendants argue they are entitled to summary judgment because the undisputed facts establish they were not deliberately indifferent to Campbell's medical needs.

The Court agrees.

1.     Applicable Law

Deliberate indifference to serious medical needs claims brought by pretrial detainees or arrestees against state actors under Section 1983 are analyzed under the Fourteenth Amendment's Due Process Clause.  Logan v. City of Schenectady, 2019 WL 3803631, at *4 (N.D.N.Y. Aug. 13, 2019) (citing Darnell v. Pineiro, 849 F.3d 17, 33 n.9 (2d Cir. 2017)).

To establish a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy a two-prong test, comprising an objective prong and a mens rea prong.  Darnell v. Pineiro, 849 F.3d at 29.  Namely, a plaintiff must establish "the challenged conditions were sufficiently serious," and defendants "acted with at least deliberate indifference to the challenged conditions."  Id.

For the objective prong, a plaintiff must establish the challenged conditions "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health."  Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)).  "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions

themselves must be evaluated in light of contemporary standards of decency.'" Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

To satisfy the mens rea prong, a pretrial detainee must sufficiently show defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell v. Pineiro, 849 F.3d at 35. The mens rea prong "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

"A delay in providing necessary medical care may in some cases constitute deliberate indifference." Maldonado v. Town of Greenburgh, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). And "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." Id. at 396–97.

### 2. Application

No reasonable jury could conclude the local police defendants deprived Campbell of constitutionally adequate medical treatment.

The record establishes Menton called for an ambulance within a minute after the shooting occurred, and then radioed again to request a rush on the ambulance. (YPD Radio Log at ECF 1). The Constitution requires no more. See Tatum v. City & County of San Francisco, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[D]ue process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."); Rasmussen v. City of New York, 766 F. Supp. 2d 399, 414 (E.D.N.Y. 2011) ("The

obligation of the police to provide necessary medical treatment upon request by a detainee or based upon the obvious need for treatment is satisfied when the police summon medical assistance; they have no duty to provide that assistance themselves.").

Indeed, the undisputed facts show Barosa and McGee provided Campbell with medical treatment beyond what the Constitution requires.  Immediately after observing the gravity of Campbell's condition, Barosa and McGee performed CPR on him until emergency medical professionals arrived.

Plaintiffs contend the team should have "arrange[d] for an ambulance or EMT to be on call."  (Pls. Opp. at 31–32).  But plaintiffs do not cite, and the Court is not aware of, any cases suggesting the absence of such arrangements violates the Fourteenth Amendment.  And even if defendants' failure to have an ambulance or EMT on call violated Campbell's constitutional rights, defendants would be entitled to qualified immunity as the law does not clearly establish such a requirement.  See Salim v. Proulx, 93 F.3d at 89.

Accordingly, plaintiffs' deliberate indifference to medical needs claim must be dismissed.

IV.   Monell Claim Against the City of Yonkers

The City of Yonkers argues plaintiffs' Monell claim fails because they have not established that a municipal policy or custom proximately caused Braig and Cooper's alleged use of excessive force.

The Court agrees.

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees."  Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006).  Instead, a municipality is liable under Section 1983 only "when execution of a [municipal] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the [plaintiff's] injury."  Monell v. Dep't of Soc. Servs., 436 U.S. at 694.

"Failure to train subordinate municipal employees will trigger municipal liability 'only where the failure to train amounts to deliberate indifference to the rights' of members of the public with whom the employees will interact."  Green v. City of New York, 465 F.3d at 80 (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  And "at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  Id. at 81.

To support their Monell claim, plaintiffs cite deposition testimony indicating Braig, Cooper, Menton, and Wissner "recalled only some new definitions and a new diagram" from their training in 2017 on YPD's then-new use of force policy, "but nothing new in how the policy operated."  (Pls. Opp. at 35).  However, these officers also testified the new policy provided more detailed information regarding the use of force, and that officers were trained and tested on the new policy.  In addition, the officers testified their use-of-force training included hypotheticals, written materials, and case studies, and that they received training in de-escalation tactics.  (E.g., Braig Dep. at 49–50; Cooper Dep. at 24–26, 33–34; Menton Dep. at 25).

Plaintiffs provide no evidence as to "how better or different training could have prevented the challenged conduct."  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 (2d Cir. 2004).  Nor do plaintiffs provide evidence of a pattern of deadly force by YPD officers so pervasive as to place the City on actual or constructive notice of an inadequacy in YPD's training program.  See Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient" to hold a municipality liable under Section 1983).

28

Finally, "plaintiffs have provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as the negligent administration of a valid [training] program, or one or more officers' negligent or intentional disregard of their training." Amnesty Am. v. Town of W. Hartford, 361 F.3d at 130.

Plaintiffs have therefore failed to raise an inference that YPD officers were improperly trained and that this deficient training caused Braig and Cooper to use excessive force. Accordingly, the Monell claim against the City of Yonkers must be dismissed.

V.      Assault and Battery Claims

Plaintiffs assert assault and battery claims against the local police defendants and the United States.[12]

A.      Local Police Defendants

The local police defendants argue plaintiffs' assault and battery claim must be dismissed because the undisputed facts show they did not use excessive force.

The Court disagrees as to defendants Braig and Cooper, but agrees as to the other local police defendants.

"Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical." Humphrey v. Landers, 344 F. App'x 686, 688 (2d Cir. 2009) (summary order).

Here, because a reasonable jury could find Braig and Cooper used excessive force against Campbell, plaintiffs' assault and battery claim against these defendants may also proceed.

---

[12]     The Court previously dismissed plaintiffs' assault and battery claim as to the FBI defendants because such a claim is not actionable under Bivens and federal employees are immune from tort claims arising out of conduct undertaken in the course of their official duties. (MTD Decision at 24).

But because plaintiffs' excessive force claim against Barosa, Malone, Marello, McGee, Menton, Walencik, and Wissner fails, the assault and battery claim against these defendants likewise fails.

> B.    United States

The United States argues plaintiffs' FTCA claim for assault and battery must be dismissed because the United States cannot be held liable for the conduct of Braig and Cooper, and because no reasonable juror could conclude the FBI defendants used excessive force or had an opportunity to prevent the shooting.

The Court disagrees that Kenney's use of deadly force was reasonable as a matter of law. However, the Court agrees summary judgment in favor of the United States is warranted to the extent plaintiffs' assault and battery claim is premised on Braig's and Cooper's use of deadly force and the other FBI defendants' conduct.

> 1.    Applicable Law

"The [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976).  "Although assault and battery claims against the federal government are usually prohibited, the FTCA permits such claims where, as here, federal law enforcement officers are alleged to have committed assault or battery." Cuoco v. U.S. Bureau of Prisons, 2003 WL 22203727, at *4 (S.D.N.Y. Sept. 22, 2003) (citing 28 U.S.C. § 2680(h)).  Indeed, "[t]he FTCA explicitly avoids waiving sovereign immunity for 'any claim arising out of assault, battery,' and several other intentional torts." Leytman v. U.S. Dep't of Homeland Sec., 804 F. App'x 78, 80 (2d Cir. 2020) (summary order) (quoting 28 U.S.C. § 2680(h)).

The FTCA defines federal employee to include individuals "acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."  28 U.S.C. § 2671.  "For the purposes of the FTCA, the common law of torts and agency defines the distinction between an independent contractor (for whose torts the Government is not responsible) and an employee, servant or agent (for whose torts the Government is responsible)."  O'Neil v. United States, 927 F. Supp. 599, 604 (E.D.N.Y. 1996).

Thus, an individual is deemed a federal employee under the FTCA only if the "strict control test" is satisfied.  In other words, the United States is liable for an individual's torts only if the federal government maintained control over and "manage[d] the details of" the individual's work, or "supervise[d] him in his daily duties."  Leone v. United States, 910 F.2d 46, 50 (2d Cir. 1990).  It is not enough for the federal government to have acted "generally as an overseer."  Id. And "[t]he government's retention of overall authority" over a law enforcement operation, "even its setting of specific objectives, will not convert local actors to federal employees, so long as the local actors 'are largely free to select the means' of reaching those objectives."  Mick v. Brewer, 1995 WL 41679, at *2 (D. Kan. Jan. 26, 1995), rev'd on other grounds, 76 F.3d 1127 (10th Cir. 1996) (quoting United States v. Orleans, 425 U.S. 807, 816 (1976)).

        2.      FTCA Liability for Braig and Cooper's Allegedly Tortious Conduct

The undisputed facts establish Braig and Cooper are not federal employees for FTCA purposes.

Plaintiffs concede Braig and Cooper were not members of the task force, employees of the FBI, paid by the FBI, or subject to the FBI's disciplinary authority.  (Pls. 56.1 Response to Fed. Defs. ¶ 21).  And although "the FBI was in command" of the operation (Braig Dep. at 72), the FBI did "not manage the details" of Braig and Cooper's work or "supervise [them] in [their]

31

daily duties." <u>Leone v. United States</u>, 910 F.2d at 50.  As plaintiffs point out, "[t]here were no details provided" to Braig and Cooper regarding the plan for "converging on or boxing-in the vehicle" or "the use of deadly force."  (Pls. Opp. at 5) (citations omitted).  Braig independently decided to position his vehicle along the driver's side of the subject vehicle, after "surveying the situation" and determining that "the suspect [ ] almost had enough room to come out from ramming" Kenney's and Malone's vehicles.  (Braig Dep. at 123, 127).  Likewise, no one in the FBI told Braig or Cooper to fire their weapons at Campbell.

Because the strict control test has not been met, the United States cannot be held liable for any torts allegedly committed by Braig and Cooper.

### 3.    FTCA Liability for Kenney's Conduct

There are triable issues of fact as to whether Kenney committed assault and battery when acting within the scope of his employment as an FBI agent.

As with the assault and battery claims against the local police defendants, "[t]he same excessive force . . . principles apply to the FTCA cause of action for assault and battery against the United States."  <u>Scott v. City of White Plains</u>, 2013 WL 1313774, at *8 (S.D.N.Y. Mar. 18, 2013).  Thus, to prevail on their FTCA claim, plaintiffs "must demonstrate that the amount of force used was objectively unreasonable."  <u>Id</u>.

There are genuine disputes as to the facts and circumstances confronting Kenney when he fired his weapon, and thus as to whether his use of deadly force was objectively reasonable. <u>Lennox v. Miller</u>, 968 F.3d at 155.  For example, a reasonable juror might credit McGee's testimony that Malone was no longer standing by the passenger side of the subject vehicle when the shooting began.  Thus, whether Kenney reasonably, although mistakenly, believed that Campbell had "opened fire on TFO Malone" (Doc. #170 ("Fed. Defs. Mem.") at 16), is "the province of the jury." <u>Jones v. Treubig</u>, 963 F.3d at 231.

Accordingly, plaintiffs' FTCA assault and battery claim, to the extent it is premised on Kenney's use of deadly force, may proceed.

4.      FTCA Liability for the Other FBI Defendants' Conduct

No reasonable juror could conclude Conlon, Fisher, or McKenna used excessive force against Campbell when acting within the scope of their employment as FBI agents.  It is undisputed that these defendants did not fire their weapons at Campbell.  And to the extent plaintiffs' assault and battery claim against these defendants is based on planner liability, failure to intervene, or the box-in maneuver, this claim fails for the reasons set forth in Part III.A above.

Accordingly, plaintiffs' FTCA assault and battery claim, insofar as it is premised on the conduct of Conlon, Fisher, and McKenna, must be dismissed.

VI.     Loss of Love, Support, and Familial Relationships Claims

The federal defendants argue plaintiffs' twentieth cause of action—comprising Eric Campbell's claim for the loss of his father's "love, support, familial relationships, and parental guidance" (SAC ¶ 277), and Aida and Robert Campbell's claims for the loss of their son's "love, support, and familial relationships" (id. ¶ 276)—must be dismissed because such losses are not compensable under New York law.

The Court agrees.

In New York, the spouse of an injured or deceased individual may recover for the "loss of consortium," which encompasses the "loss of support or services," as well as "love, companionship, affection, society, sexual relations, solace and more."  Rangolan v. County of Nassau, 370 F.3d 239, 248 (2d Cir. 2004) (quoting Millington v. Se. Elevator Co., 22 N.Y.2d 498, 504-05 (1968)).  But New York courts do not permit a child to recover for "the loss of parental care, companionship, guidance, love and training," or a parent to recover for the loss of their child's "affection, love and companionship."  De Angelis v. Lutheran Med. Ctr., 84 A.D.2d

17, 26–27 (2d Dept. 1981), aff'd De Angelis v. Lutheran Med. Ctr., 58 N.Y.2d 1053, 1055

(1983); see also Devito v. Opatich, 215 A.D.2d 714, 715 (2d Dep't 1995) (plaintiffs' "loss of

their minor daughter's society . . . is not compensable").

Accordingly, plaintiffs' claims for loss of love, support, familial relationships, and

parental guidance must be dismissed.

VII.   Wrongful Death and Conscious Pain and Suffering Claims

Plaintiffs' claims for wrongful death and conscious pain and suffering are derivative of

their claims for excessive force and assault and battery.  See Chamberlain v. City of White

Plains, 986 F. Supp. 2d 363, 398–99 (citing N.Y. Est. Powers & Trusts Law §§ 5–4.1, 11–

3.2(b)).

Because there are genuine issues of material fact as to whether the use of deadly force

was objectively reasonable, for the reasons stated above, the Court declines to dismiss plaintiffs'

wrongful death and conscious pain and suffering claims as against Braig, Cooper, and the United

States.

However, because plaintiffs' excessive force and assault and battery claims fail as against

Barosa, Malone, Marello, McGee, Menton, Walencik, and Wissner, the wrongful death and

conscious pain and suffering claims against these defendants likewise fail.  See Chamberlain v.

City of White Plains, 986 F. Supp. 2d at 399 ("Because [the defendant] committed no underlying

wrong against [the decedent], the conscious pain and suffering and wrongful death claims also

fail as a matter of law.").

VIII.   Respondeat Superior Claims

Plaintiffs bring respondeat superior claims against the City of Yonkers premised on the

allegedly tortious conduct of the YPD officers who participated in the operation, defendants

Braig, Cooper, Marello, Menton, Walencik, and Wissner.

Unlike Section 1983, New York law permits plaintiffs to hold municipalities vicariously liable for torts committed by municipal employees while acting within the scope of their employment.  See Triolo v. Nassau Cnty., 24 F.4th 98, 110 (2d Cir. 2022); Jones v. State of New York, 33 N.Y.2d 275, 279-80 (1973) ("A long line of cases has held the State or municipalities liable for the actions of their police officers in the line of duty.").

Because plaintiffs have "not demonstrated any basis for liability on the part of" Marello, Menton, Walencik, or Wissner, they "cannot establish respondeat superior liability for those claims."  Yusuf v. City of New York, 2022 WL 393882, at *11 (E.D.N.Y. Feb. 9, 2022).

However, for the reasons stated above, a reasonable jury could find Braig's and Cooper's use of deadly force was excessive, and thus constituted assault and battery under New York law. Accordingly, plaintiffs' claim against the City of Yonkers for assault and battery, and the derivative claims for wrongful death and conscious pain and suffering, may proceed.

## CONCLUSION

The Tarrytown defendants' motion for summary judgment (19 Civ. 2117 Doc. #174) is GRANTED.

Defendant Malone's motion for summary judgment (19 Civ. 2117 Doc. #186) is GRANTED.

The federal defendants' motion for summary judgment (19 Civ. 2117 Doc. #169 and 19 Civ. 9444 Doc. #89) is DENIED as to plaintiffs' claims against the United States for assault and battery, wrongful death, and conscious pain and suffering, solely to the extent such claims are premised on Kenney's use of deadly force.  The federal defendants' motion is otherwise GRANTED.

The Yonkers defendants' motion for summary judgment (19 Civ. 2117 Doc. #178) is DENIED as to (i) plaintiffs' respondeat superior claim against the City of Yonkers for assault

and battery, wrongful death, and conscious pain and suffering, and (ii) plaintiffs' claims against Braig and Cooper for excessive force, assault and battery, wrongful death, and conscious pain and suffering, solely to the extent such claims are premised on Braig's and Cooper's use of deadly force.  The Yonkers defendants' motion is otherwise GRANTED.

The Clerk is instructed to terminate the following defendants:  Police Officer Adam Walencik, Detective Thomas Marello, Sergeant Mark Wissner, Detective Brian Menton, Detective Terence Malone, Sergeant Joseph Barosa, Detective Michael McGee, Agent Brendan Kenney, Agent Andrew Fisher, Agent Daniel Conlon, and Agent Daniel McKenna.

Counsel for the remaining parties shall attend a case management conference on September 12, 2023, at 11:00 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions.  Counsel shall also be prepared to discuss what efforts they have made and will continue to make to settle this case.

The Clerk is instructed to terminate the motions.  (19 Civ. 2117 Docs. ##169, 174, 178, 186, and 19 Civ. 9444 Doc. #89).

Dated: July 31, 2023
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge